lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SOFCO, LLC, et al.,                          )
                                             )
                                             )
        Plaintiffs                  )
                                             )
  vs.                                    )        Case No. 08-2366-JAR
                                             )
NATIONAL BANK OF KANSAS CITY,  )
                                             )
        Defendant.                  )
_____ )

## MEMORANDUM AND ORDER

Plaintiffs SOFCO, LLC ("SOFCO"), R. Scott Christian and Robert R. Jones

(collectively "plaintiffs"), filed this lawsuit against National Bank of Kansas City ("NBKC")

alleging breach of contract, breach of duty of good faith and fair dealing, and breach of fiduciary

duty.  This matter is before the Court on NBKC's Motion for Summary Judgment[1] and Stay of

Discovery (Doc. 45), as well as plaintiffs' Motion for Leave to File First Amended Complaint

(Doc. 48) to add claims of fraud and negligent misrepresentation and for punitive damages.

Discovery has been stayed pending disposition of the summary judgment motion.[2]  NBKC

objects to plaintiffs' request for leave to amend the complaint.  For the reasons set forth in detail

below, the Court grants defendant's Motion for Summary Judgment and grants plaintiffs' motion

---

[1] In response to defendant's reply brief, plaintiffs filed a Motion for Leave to File Surreply (Doc. 74), which defendant opposes.  Because the reply could be construed to raise new arguments, due in large part to the briefing deficiencies perpetuated by the parties, the Court grants plaintiffs' motion and has considered the arguments raised in the surreply as applicable.

[2] (Doc. 68.)

for leave to amend their Complaint.

I.      **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[3] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[3]Fed. R. Civ. P. 56(c).

[4]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[7]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

"set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[11]  To accomplish this, the facts "must be

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

therein."[12]  Rule 56(e) provides that opposing affidavits must be made on personal knowledge

and shall set forth such facts as would be admissible in evidence.[13]  The non-moving party

cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by

specific facts, or speculation.[14]

　　　When deciding a summary judgment motion, the Court may consider evidence submitted,

if admissible in substance, even if it would not be admissible, in form, at the trial.[15]  The Tenth

Circuit has explained,

> Parties may, for example, submit affidavits in support of summary
> judgment, despite the fact that affidavits are often inadmissible at
> trial as hearsay, on the theory that the evidence may ultimately be
> presented at trial in an admissible form.  Nonetheless, "the content

---

[9]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[10]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(e).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Argo.*, 452 F.3d at 1199.

or substance of the evidence must be admissible."  Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form.  The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage.  To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.[16]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is

an important procedure "designed to secure the just, speedy and inexpensive determination of

every action."[17]  In responding to a motion for summary judgment, "a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

mere hope that something will turn up at trial."[18]

## II.   Uncontroverted Facts

Before reaching the uncontroverted facts, the Court first admonishes plaintiffs' counsel

for failing to comply with the local rule for summary judgment responses, which requires:

(1) . . . [A] section that contains a concise statement of material facts as to which the party contends a genuine issue exists.  Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the

---

[16]*Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)); Fed. R. Civ. P. 56(e) (citations omitted).

[17]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[18]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

4

opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed.

(2) if the party opposing summary judgment relies on any facts not contained in the movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above.[19]

The response must "fairly meet the substance of the matter asserted."[20]

Instead of tracking NBKC's Statement of Uncontroverted Facts, indicating those that are disputed and the reasons why, with citation to the record, plaintiffs skip to Rule 56(b)(2), and set forth additional facts in separately numbered paragraphs, with reference to the uncontroverted fact it purportedly disputes. For example, plaintiffs' paragraph 2 states that the License Agreement and Employment Agreements contain provisions satisfying the elements of a joint venture under Kansas law, citing examples, with the endnote, "[c]ontroverts defendants SoUF Nos. 5, 6, 10, 15, 16, 18, 19." Plaintiffs' additional facts are replete with argument and legal conclusions. Consequently, NBKC's attempt to reply to these additional facts as required by the Rule also contains inappropriate argument to counter that made by plaintiffs. Plaintiffs have also filed a Motion for Leave to File Surreply, in an apparent effort to alleviate some of the confusion it set in motion in its reponse.

The Court would be remiss if it did not also point out that NBKC frequently gives in to the temptation to offer commentary about plaintiffs' arguments, dismissing them as "ridiculous" and speculating as to whether they have read the License Agreement at all. NBKC also fails to

---

[19]D. Kan. R. 56.1(b) (emphasis added).

[20]R. 56.1(e).

include relevant information in its statement of facts, instead devoting several pages of its opening brief to "introductory" background information.

Plaintiffs' failure to strictly comply with the local rules, coupled with the tone of the parties' briefs, has made this Court's task much more difficult and has consumed more of the Court's time and energy than should be necessary in ruling on a motion for summary judgment. Although the Court will not go so far as to deem defendant's facts uncontroverted, it will largely disregard the arguments set forth in plaintiffs' statement of facts, such as their interpretation of contract provisions, and instead will look directly to the written contracts themselves.

Consistent with the well-established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to the nonmoving party.  NBKC is a national banking association, duly organized and existing under the laws of the United States of America, with its principal local offices in Overland Park, Kansas.  Plaintiff SOFCO is a limited liability company organized under the laws of Colorado. Plaintiffs Scott Christian and Robert Jones are each a member and principal of SOFCO.  In December 2005, Christian and Jones presented a business concept to NBKC concerning mortgage services related to the fractional interest mortgage loan industry.[21]

On or about June 1, 2006, NBKC and SOFCO entered into a License Agreement, whereby SOFCO (the "Licensor") agreed to license use of the fractional mortgage financing concept (the "Licensed Assets") to NBKC (the "Company"), in connection with the business of the First Fractional Funding Division (the "Division" or "F3").  "Licensed Assets" are described

---

[21]This concept is characterized by a fee ownership interest in vacation and resort real estate divided among more than one owner, each of whom owns a "fraction" of the real estate.

6

in Schedule 1 of the Agreement as the "Feasibility/Business/Marketing Plan" document

presented to NBKC in December 2005, with the trade name of "First Fractional Funding™."

Section 2 of the License Agreement states that the Company shall pay Licensor for use of the

Licensed Assets an annual royalty fee equal to the Royalty Rate, which is 50%, multiplied by the

Pre-Tax Net Income of the Division, and that the fee shall be paid for the prior calendar year.

"Pre-Tax Net Income" is defined in Section 17(p) as "the Division's income, including the loan

loss provision but before provision for income taxes for such period and after deducting

reasonable expenses attributable to the Division and incurred by the Company on account of the

Division . . . ."

The License Agreement contains a termination provision at Section 5 that states,

> Except as otherwise set forth herein, this Agreement will terminate:
>
> (a) by mutual agreement of the parties;
>
> (b) upon Sale of the Division or Sale of the Company and payment to Licensor of the amounts due to the Licensor set forth in Section 6(b);
>
> (c) Upon sale of the Licensed Assets and Licensor's stake in the value of the Division to NBKC pursuant to Sections 6(c) or 6(d);
>
> (d) upon consummation of a Buy Out by Licensor pursuant to Sections 6(c) or 6(d); or
>
> (e) as set forth in Sections 6(e)(i),(ii) and (iii) and in Section 7.

Section 6(c) of the License Agreement provides for buyout by NBKC:

> The Company may give Licensor a written notice which shall specify an amount that the Company is willing either (1) to pay to Licensor or its designee(s) **for the Licensed Assets**, or (2) to receive from Licensor for the sale of the Company's **interest in the Division** to Licensor, and shall also provide Licensor 90 days from the giving of such notice to select either (1) or (2)

immediately above. **The amount specified by Company shall reflect Company's and Licensor's understanding that by virtue of its ownership of the Licensed Assets, Licensor shall have a stake in the value of the Division equal to the Royalty Rate**; accordingly, the cash amount to be paid to Licensor or its designee(s) by Company if option (1) is selected by Licensor shall be calculated using the **Company Purchase Calculation**. The cash amount to be paid by Licensor to Company if option (2) is selected by Licensor shall be calculated using the **Licensor Purchase Calculation**.

Such selection shall be made by Licensor's written notice to the Company within said 90-day period, and it shall be binding and irrevocable once made. The Company shall be bound to honor such selection and all parties shall proceed to consummate, and consummate, such selection within 60 days after the Licensor's selection. If the Licensor fails or refuses to make a selection as provided above, the Company may make it for the Licensor (which shall be binding on the Licensor) by written notice to it of the Company's selection within 10 days after expiration of said initial 90-day period. If no selection is made by the Company within said 10-day period, its written notice shall be deemed withdrawn. (emphasis added).

The Company Purchase Calculation is defined in Section 17(c) as "the sum of the amount specified by Company or Licensor in a buy out notice provided pursuant to Section 6(c) or 6(d), minus Net Assets, minus Negative Carry, plus the unused loan loss reserve attributable to the Division (to be disbursed as mutually agreed), multiplied by the Royalty Rate." Section 6(a) states that, for purposes of the provisions of the License Agreement relating to buy out, sale or purchase of the Division, "loans originated through the Division shall not be deemed to be assets of the Division." Further, the calculation illustrations in Schedule 3, attached to the Agreement, are "solely for the purpose of illustration of the calculations of the amounts to be paid to Company or Licensor" pursuant to Section 6.

The License Agreement states that the "Agreement contains the entire agreement of the

8

parties relating to the subject matter hereof" and may not be modified except by an agreement in writing.

On or about May 1, 2006, NBKC entered into an Employment Agreement with Christian and Jones, respectively.  Both Christian and Jones were employed as Executive Vice President responsible for managing the First Fractional Funding Division of NBKC.  The Employment Agreements state that Christian and Jones recognize and agree "that the operation of the Division is subject at all times to the control of the Company."  Both plaintiffs were paid a specified salary and were provided with other "such benefits as are generally available to executive officers" of NBKC.  They were both employed at the will of NBKC, subject to termination at any time by written notice.  Each Employment Agreement contemplates termination of plaintiffs' employment in the event NBKC exercises its buy out rights pursuant to the Licence Agreement.  Each Employment Agreement states that it contains the entire agreement of the parties relating to plaintiffs' employment by NBKC, including any previous agreement concerning their employment, and may not be modified except by an agreement in writing.

Plaintiffs had the benefit of advice of counsel throughout the process of negotiating the License Agreement and the Employment Agreements.  They both testified that there is nothing about their understanding of the relationship from prior or contemporaneous communications with NBKC that is not reflected in the written agreements entered into with NBKC.

On March 12, 2008, NBKC held a special meeting of the Board of Directors, where the decision to stop funding F3 loans was made.  Plaintiffs were notified the following morning of the decision and a Notice of Buy Out was mailed to SOFCO that day.  In the Notice of Buy Out to SOFCO dated March 13, 2008, NBKC stated that it was initiating the buy out process of the

9

Division and specified that it was willing to pay or receive $319,000 pursuant to the provisions

of Section 6(c) of the License Agreement.  The relevant portion of the Notice states:

> Under Section 6(c) of the License Agreement, NBKC must specify
> an amount that it is willing either (1) to pay to SOFCO for the
> Division, or (2) to receive from SOFCO for the sale of its interest
> in the Division.  NBKC hereby specifies this amount to be
> **$319,000.**
>
> The actual cash amount to be paid to SOFCO if option (1) is selected will
> be **$50,000** as calculated by the applicable Company Purchase
> Calculation, and the cash amount to be paid by SOFCO to NBKC if option
> (2) is selected will be **$269,000** as calculated by the applicable Licensor
> Purchase Calculation.  For your reference, we have attached to this letter
> the detail for these calculations. (emphasis in original).

The Notice stated it was deemed delivered on March 16, 2008, in accordance with

Section 12 of the License Agreement, and that SOFCO had until June 14, 2008 to make its

selection whether to sell or purchase the Division for the specified amount.  The letter also

offered an incentive of an additional $50,000 to SOFCO if the buyout transaction was completed

by March 31, 2008.  A detailed calculation of the buy out amounts was attached to the letter, and

used the following assumptions:

| | | |
|---|---|---|
| Buyout Amount for Division | $ | $319,000 |
| Allowance for Loan Losses (ALLL) | $ | 587,000 |
| Negative Carry | $ | 798,000 |
| Net Assets | $ | 8,000 |

The Company Purchase Calculation was calculated as follows:

| | | |
|---|---|---|
| Amount for Division | $ | 319,000 |
| Less: Net Assets | $ | (8,000) |
| | | _____ |
| Amount after Net Assets | $ | 311,000 |
| Plus ALLL | $ | 587,000 |
| Less: Negative Carry | $ | (798,000) |
| | | _____ |
| Adjusted Value | $ | 100,000 |
| Royalty Rate | | 50% |
| Company Purchase Calculation/ Amount to SOFCO | $ | 50,000 |
| | | _____ |

By comparison, the Licensor Purchase Calculation was calculated as follows:

| | | |
|---|---|---|
| Amount for Division | $ | 319,000 |
| Less: Net Assets | $ | (8,000) |
| | | _____ |
| Amount after Net Assets | $ | 311,000 |
| 100%-Royalty Rate | | 50% |
| | | _____ |
| Licensor Purchase Calculation b/f Adjmt | | $ 155,500 |
| | | |
| Less: ALLL | $ | (587,000) |
| Plus: Negative Carry | $ | 798,000 |
| | | _____ |
| Adjustments | $ | 211,000 |
| Royalty Rate | | 50% |
| Licensor Purchase Calculation of Adjmt | | $ 105,500 |
| Plus: Net Assets | | $ 8,000 |
| Amount to NBKC | | $ 269,000 |
| | | _____ |

On March 13, 2008, NBKC also informed Christian and Jones of its decision to initiate the buyout process of the Division pursuant to Section 6(c) of the License Agreement, and of their termination as employees in connection with that sale.

On March 26, 2008, SOFCO rejected NBKC's incentive offer to close by March 31, 2008, and objected to NBKC's decision to shut down F3 operations and cease making any more fractional loans.  Christian and Jones expressed frustration with NBKC for its purported refusal to provide them with confidential loan portfolio information that plaintiffs contended was necessary in order to find another funding partner and asserted that NBKC refused to fund loans already underwritten and approved by F3's underwriter.

On June 11, 2008, SOFCO responded to the March 13 Notice of Buy Out, and pointed out that Section 6(c) of the License Agreement provides for the amount the Company is willing to pay Licensor for the Licensed Assets, rather than the Division.  Plaintiffs further responded that under their reading of Section 6(c), if SOFCO sells the Licensed Assets for $50,000, it will retain its interest in the Division and right to receive 50% of the income of the Division from the existing fractional interest mortgage loan portfolio as it presently exists, which they understood to be approximately $74 million of such loans.  Alternatively, if NBKC was not willing to confirm SOFCO's 50% interest, then SOFCO exercises its right to select option (2) to purchase NBKC's interest in the Division for $269,000, which would result in SOFCO being entitled to receive all the net income from the loan portfolio as it exists at closing.

When SOFCO refused to select one of the two options given in the Notice of Buy Out by June 14, 2008, NBKC elected to make the selection for SOFCO by written notice within ten days after expiration of the initial 90-day period, and notified SOFCO on June 23, 2008, that it

13

selected the first option, to pay SOFCO for the Licensed Assets.  Based on SOFCO's failure or refusal to select a buy out option, on August 15, 2008, NBKC forwarded a check to SOFCO in the amount of $50,000, as specified in the March 13, 2008 letter, which SOFCO returned.

## III.     Discussion

NBKC moves for summary judgment on plaintffs' four claims: breach of the Licensing Agreement and Employment Agreements, breach of the duty of good faith and fair dealing arising from the agreements, and breach of fiduciary duty.  Because plaintiffs' claims are premised in large part on their assertion that the agreements constitute a joint venture, the Court will start its analysis with the claim for breach of fiduciary duty based on the allegation that the business arrangement entered into between the parties constitutes a joint venture under Kansas law.

### A.     Breach of Fiduciary Duty

Plaintiffs claim that NBKC breached its fiduciary duty when it shut down F3, stopped funding further fractional interest mortgage loans originated by SOFCO, and sent the Notice of Buy Out attempting to misapply the terms of the License Agreement.  Under Kansas law, "[a] fiduciary relation . . .exist[s] in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.'"[22] There are two types of fiduciary relationships:

> (1) those specifically created by contract such as principal and
> agent, attorney and client, and trustee cestui que trust, for example,
> and those created by formal legal proceedings such as guardian

---

[22]*Denison State Bank v. Madeira*, 640 P.2d 1235, 1242 (Kan. 1982) (quoting *Lindholm v. Nelson*, 264 P. 50, 54 (Kan. 1928)).

14

> and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.[23]

"Absent clear intent by the parties, an ordinary business relationship should not be converted into a fiduciary relationship."[24]  "[C]onscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law."[25]

Plaintiffs contend that they had a fiduciary relationship with NBKC because the parties had formed a joint venture under Kansas law and because the relationship was implied in law. Whether a fiduciary relationship existed is a question of law.[26]

### Joint Venture

"Under Kansas law, in general, a 'fiduciary duty' exists among joint venturers."[27]  "A joint venture is defined in general terms to be a special combination of two or more persons devoted to a specific enterprise in which profit is jointly sought without actual partnership or corporate designation."[28] "The relationship may arise from express contractual provisions or out

---

[23]*Rajala v. Allied Corp.*, 919 F.2d 610, 613 (10th Cir. 1990) (quoting *Denison*, 640 P.2d at 1241).

[24]*Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 340 F. Supp. 2d 1189, 1198 (D. Kan. 2004) (citing *Gottstein v. Nat'l Ass'n for Self Employed*, 53 F. Supp. 2d 1212, 1222 (D. Kan. 1999) (citing *Denison*, 640 P.2d at 1243).

[25]*Id*. (quoting *Rajala*, 919 F.2d at 615) (citation omitted).

[26]*Id* (citing *In re Villa W. Assocs.*, 146 F.3d 798, 806 (10th Cir. 1998)).

[27]*Id*. (quoting *In re Klippel*, 183 B.R. 252, 259 (Bankr. D. Kan. 1995)) (citation omitted).

[28]*Id*. (quoting *Opco, Inc. v. Scott*, 321 F.2d 471, 473 (10th Cir. 1963)) (citation omitted).

of acts and conduct."[29]  "'When the relationship of joint adventurers exists, the parties stand in

close relationship of trust and confidence and are bound by the same standards of good conduct

and square dealing as are required of partners.'"[30] The following acts or conduct are indicative of

a joint venture, although no single factor is determinative:

> (1) the joint ownership and control of property; (2) the sharing of
> expenses, profits and losses, and having and exercising some voice
> in determining the division of the net earnings; (3) a community of
> control over the active participation in the management and
> direction of the business enterprise; (4) the intention of the parties,
> express or implied; and (5) the fixing of salaries by joint
> agreement.[31]

The burden of proving a joint venture rests upon the party asserting its existence.[32]

Although plaintiffs contend that they are confident they can prove the existence of a joint

venture in this case, in their response they limit their discussion to the second factor, sharing of

profit and risk.  Plaintiffs argue that this factor is met because the License Agreement contains

several provisions that reflect a sharing of profit and risk, including the establishment of the

License Fee to SOFCO for the use of the Licensed Assets as 50% of the Pre-Tax Net Income of

the Division as well as the Section 6 buy out provisions, which state that the amount specified in

a buy out by either party "shall reflect the Company's and Licensor's understanding that by

virtue of its ownership of the Licensed Assets, Licensor shall have a stake in the value of the

---

[29]*Id.*

[30]*Id.* (quoting *Amoco Prod., Co. v. Charles B. Wilson, Jr., Inc.*, 976 P.2d 941, 949 (Kan. 1999)) (citation omitted).

[31]*Id.* (quoting *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816, 823 (Kan. 1979)).

[32]*Flight Concepts Ltd. P'ship v. Boeing* , 819 F. Supp. 1535, 1547 (D. Kan. 1993).

16

Division equal to the Royalty Rate [50%]."  Plaintiffs also cite to the provisions in the Employment Agreements that provide for termination of plaintiffs Christian and Jones if the Pre-Tax Net Income of the Division was a loss in excess of $100,000 the first year, did not exceed zero the second year, and did not exceed $250,000 during any subsequent year as well as, that if plaintiffs were terminated as a result of NBKC's breach, NBKC must pay SOFCO a "Partial Buyout Amount," which requires determining "Division Value," which is defined in the License Agreement as "the value of the Division as a going concern as determined by an independent valuation company jointly chosen by Company and Licensor."

While the License Agreement provides that SOFCO would be paid a royalty fee of 50% of the Pre-Tax Net Income, such a plan is inconsistent with a joint venture, as royalties are simply the contract price paid for licensing a trademark.[33]  Even if the royalty fees did satisfy the profit-sharing factor, plaintiffs have not provided any evidence that the parties agreed to share losses.  NBKC paid most, if not all of the expenses attributable to the Division, as set forth in Schedule 2 of the Licensing Agreement, and reimbursed Christian and Jones for any expenses incurred as part of their operation of the Division.  Moreover, SOFCO did not have a voice in determining the division of net income , as the License Agreement provided for payment of an annual royalty fee based upon a predetermined formula.  And, the salaries paid to Christian and Jones for management of the Division, regardless of the Division's net income, adds support to

---

[33]*See Terra Venture*, 340 F. Supp. 2d at 1198-99 (finding no evidence of shared profits or losses where plaintiffs were paid earnout fee based on percentage return on project); *PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1488, 1496 (D. Kan. 1996) (finding no evidence of shared profits or losses where contract provided plaintiff would be paid a certain percentage of merchant sales where the customer used a Discover Card); *Flight Concepts*, 819 F. Supp. at 1547 (finding no evidence of shared profits where Licence Agreement provided that plaintiffs would be paid a royalty for the sale of each airplane); *see also Dinaco, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (holding royalty agreement between parties that provided a royalty of 10% net revenues was not evidence of an agreement to share profits).

the conclusion that the parties did not intend to share the expenses, profits and losses of the Division.

Although plaintiffs fail to mention or analyze application of the other four factors, the Court will discuss each in turn.  The first factor is joint ownership and control of the property.  The License Agreement provides that SOFCO grants to NBKC the right to use the Licensed Assets, "which [NBKC] acknowledges [SOFCO] owns and controls."  Conversely, the License Agreement specifies that "*by virtue of its ownership of the Licensed Assets*, [SOFCO] shall have a stake in the value of the Division. . . ." (emphasis added).   Moreover, the Employment Agreements provide that "the operation of the Division is subject at all times to the control of [NBKC]."  Section 6(b) of the License Agreement states that upon a sale of the Division to a third party, SOFCO is to receive a sum equal to the 50% Royalty Rate "multiplied by the Net Sale Proceeds upon sale of the Division," which is defined in Section 17(o) as "the selling price for the Division minus the Net Assets, plus the unused loans loss reserve attributable to the Division, . . . minus Negative Carry and further reduced by the expenses of sale incurred by the Company . . . but before income taxes."  That section goes on to provide, however, that upon payment of this amount to SOFCO, SOFCO shall transfer ownership of the Licensed Assets to the Company.  And, Section 6(a) of the License Agreement provides that for purposes of section 6, loans originated through the Division shall not be deemed assets of the Division.  Thus, under the express terms of the Agreements, there was no joint ownership and control of either the Licensed Assets or the Division.

The third factor is a community of control.  The License Agreement grants the Company the exclusive right and license to use the Licensed Assets, which are owned and controlled by

SOFCO, in connection with the business of the Division.  The Employment Agreements provide

that Christian and Jones would manage the Division and were "subject always to the direction

and control of the Board of Directors of the Company."  Plaintiffs also agreed that "the operation

of the Division is subject at all times to the control of the Company."  Based on these express

provisions of the agreements, the Court cannot find community of control over the management

and direction of the Division.

The fourth factor is the intention of the parties.  The requisite intent of parties required to

create a joint venture may be express or implied.[34]  The License Agreement is silent on the

issue—it does not expressly refer to the relationship as a joint venture, nor does it disclaim the

parties' intent to enter into a joint venture.  Plaintiffs argue that this factor is met because the

parties repeatedly referred to their relationship as a joint venture in communications prior to

execution of the Licensing Agreement.  Such evidence, however, is inadmissible under the parol

evidence rule.[35]  Even if the Court were to consider this evidence, however, the parties' referral

to their relationship as a joint venture is insufficient where, as here, the parties did not

specifically agree that their legal relationship was a joint venture.[36]

Finally, the fifth factor, the joint fixing of salaries, is not present in this case.  Although

the Employment Agreements provide for specified salaries for Christian and Jones, plaintiffs had

no control over the salaries paid to NBKC.

---

[34]*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816, 823 (Kan. 1979).

[35]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[36]*See Terra Venture*, 340 F. Supp. 2d at 1199 (finding showing of intent insufficient where parties referred to their relationship as a joint venture and held themselves out to the public as a joint venture, but did not specifically agree that their legal relationship was a joint venture).

Viewing the record in the light most favorable to plaintiffs, plaintiffs have presented no affirmative or specific facts that could lead a rational trier of fact to conclude that a joint venture existed between the parties.  Based on the analysis of the above factors, the Court concludes that the agreement between plaintiffs and NBKC established contractual obligations, not a joint venture.

### Implied in Law

Plaintiffs also contend that a fiduciary duty existed by virtue of the parties' conduct. Plaintiffs rely on Schedule 4 of the License Agreement, which provides terms of use related to the Licensed Assets owned by SOFCO.   Plaintiffs argue that Schedule 4 "reads like a fiduciary play-book," stating that NBKC "will maintain, or cause to be maintained, the highest standard of quality in the provision, operation, promotion, marketing, advertising, sale or maintenance of any and all services associated with the [F3 trademarks]," and that NBKC will not do anything that "may disparage, bring into disrepute, or otherwise injure the [F3 trademarks], the goodwill associated therewith, or any applications for registration or registrations thereafter."  By so agreeing, plaintiffs argue, NBKC assumed fiduciary duties for the benefit of plaintiffs.  NBKC responds that it did not consciously assume fiduciary duties toward plaintiffs, as evidenced by the relationship between the parties.

The existence of an implied fiduciary relationship depends on the facts and circumstances of each case.[37]  The Kansas Supreme Court has set forth certain factors to consider in determining whether a fiduciary relationship exists:

---

[37]*Estate of Pingree v. Triple T Foods, Inc.*, 430 F. Supp. 2d 1226, 1239 (D. Kan. 2006) (citing *Denison State Bank v. Madeira*, 640 P.2d 1235, 1241 (1982).

> A fiduciary relationship impacts a position of peculiar confidence placed by one individual in another.  A fiduciary is a person with a duty to act primarily for the benefit of another.  A fiduciary is in a position to have and exercise, and does have and exercise influence over another.  A fiduciary relationship implies a condition of superiority of one of the parties over the other.  Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.[38]

Not all factors need be present in any particular case.[39]

A fiduciary relationship cannot be created by accident or inadvertence.[40]  Instead, the Tenth Circuit has emphasized that the "conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law."[41]  To this end, "[m]ere concert of action without more, does not establish a fiduciary relationship. . .  Undoubtedly, parties may deal at arm's length for their mutual profit.  It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises."[42]

Having reviewed the record, the Court fails to see how the evidence supports a finding that NBKC consciously assumed fiduciary duties in this case.  Schedule 4 of the License Agreement merely obligates NBKC to maintain high standards of quality in the operation and

---

[38]*Denison,* 640 P.2d at 1241.

[39]*Id.*

[40]*Rajala v. Allied Corp.*, 919 F.2d 610, 614 (10th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991) (citing *Wolf v. Brungardt*, 524 P.2d 726, 736 (1974)).

[41]*Id.* at 615; *see Denison*, 640 P.2d at 1243-44 ("one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.")

[42]*JDN Dev. Co. v. Terra Venture, Inc.*, 265 F. Supp. 2d 1239, 1253 (D. Kan. 2003) (quoting *Wolf*, 524 P.2d at 736).

marketing of the F3 trademarks; any alleged violation of the provisions of Schedule 4 can be addressed in plaintiff's breach of contract claims.  There is nothing in any of the agreements entered into by these parties that suggests that plaintiffs placed their property or business in NBKC's hands to operate primarily for plaintiffs' advantage.  To the contrary, the evidence indicates that NBKC controlled all aspects of the Division, including use of the Licensed Assets owned by plaintiffs, supporting an inference that it was acting in its own financial interests, not plaintiffs'.  Moreover, all of the agreements indicate that "the relationship between the parties was arm's length for the mutual but separate benefit of the plaintiffs and the defendant."[43] Finally, plaintiffs Christian and Jones were employees at will of NBKC.  Kansas law expressly provides that an employer-employee relationship "does not create fiduciary obligations on the part of the employer."[44]  Accordingly, the Court determines that the evidence does not support a fiduciary relationship implied in law.

### B.  Breach of Contract

The Court agrees with plaintiffs that their contract claims do not depend upon the success of their claim that a joint venture exists.  Nevertheless, the Court finds that their arguments in support of their claims are circular, and must fail as a matter of law.

The elements for a breach of contract claim under Kansas[45] law are: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to

---

[43]*Flight Concepts Ltd. P'ship v. Boeing*, 819 F. Supp 1535, 1546 (D. Kan. 1993).

[44]*Estate of Pingree v. Triple T Foods, Inc.*, 430 F. Supp. 2d 1226, 1240 (D. Kan. 2006) (citing *Orr v. Heiman*, 12 P.3d 387, 392 (Kan. 2000)).

[45]Both the License Agreement and Employment Agreements provide that the laws of the State of Kansas control "any legal proceeding" concerning the agreements.

perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff suffered damage caused by the breach.[46]

The construction of a written contract is a question of law.[47]  Generally, if the language in a written contract "is clear and can be carried out as written, there is no room for rules of construction."[48]  "'In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[49]  The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.[50]  Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parol evidence.[51]  The provisions of a written contract must be interpreted as a whole and in harmony rather than in isolation.[52]

Whether a contract is ambiguous is also a question of law for the court.[53]  "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the

---

[46]*See, e.g.*, *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003).

[47]*See, e.g.*, *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

[48]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[49]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[50]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (citing *Hollenbeck v. Household Bank*, 829 P.2d 903, 903–06 (Kan. 1992)).

[51]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[52]*Decatur County Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (citations omitted).

[53]*Simon*, 829 P.2d at 888.

23

face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning."[54]  "The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists."[55]  To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[56]  Any ambiguity in a contract will be construed against the drafter.[57]  But where an ambiguous contract is prepared jointly and equally by the parties, it will not be liberally or strictly construed against either party.[58]  The Court is to use common sense and not strain to create an ambiguity in a written instrument when one does not exist.[59]  The fact that the parties do not agree over the meaning of terms does not in and of itself prove that the contract is ambiguous.[60]

Neither party argues that the contracts are ambiguous, but dispute whether a breach of the License Agreement and Employment Agreements occurred based on differing interpretations of the terms of the contract. The Court discusses each in turn.

---

[54]*Id.* (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 810 P.2d 283, 284 (Kan. 1991).

[55]*Kay-Cee Enter.*, 45 F. Supp. 2d at 843 (citing *Arnold v. S.J.L. of Kan. Corp.*, 749 P.2d 64 (Kan. 1991)).

[56]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[57]*Liggatt v. Employers Mut. Cas. Co.*, 46 P.3d 1120, 1126 (Kan. 2002).

[58]*Colburn v. Parker & Parsley Dev. Co.*, 842 P.2d 321, 328 (Kan. Ct. App. 1992) (quoting *Crestview Bowl, Inc. v. Womer Contr. Co.*, 592 P.2d 74 (1979)).

[59]*Eggleston v. State Farm Mut. Auto. Ins. Co.*, 906 P.2d 661, 662 (Kan. Ct. App. 1996), *rev. denied*, 261 Kan. 1086 (1997).

[60]*Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996), *rev. denied*, 261 Kan. 1086 (1997).

1.      **License Agreement**

***Notice of Buy Out***

The License Agreement states that if NBKC elects to exercise the Buy Out by Company provision in Section 6(c), it "may give Licensor written notice" specifying the amount NBKC is willing either to pay SOFCO for the Licensed Assets, or to receive from SOFCO for NBKC's interest in the Division.  The License Agreement further provides that "the amount specified by the Company shall reflect Company's and Licensor's understanding that by virtue of its ownership of the Licensed Assets, Licensor shall have a stake in the value of the Division equal to the Royalty rate, and that the cash amount to be paid to Licensor shall be calculated by using the "Company Purchase Calculation."  Plaintiffs argue that the "Notice of Buy Out" sent by NBKC on March 13, 2008 to SOFCO did not comply with the language of Section 6(c) of the License Agreement because (1) it did not specify the amount NBKC was willing to pay for the Licensed Assets, but instead, referred to the amount it was willing to pay for the Division, and (2) it failed to reflect that SOFCO "shall have a stake in the value of the Division equal to the Royalty Rate (50%)."

Although NBKC specified the amount it was willing to pay plaintiffs for the Division instead of the Licensed Assets, the Notice of Buy Out specifically referred to Section 6(c) of the License Agreement and stated that the letter was being provided in order to initiate the buy out process by NBKC.  NBKC specified $319,000 as the amount it was willing to either pay SOFCO or to receive from SOFCO, and provided the actual cash amount to be paid under either option based upon formulas set out in the License Agreement.  NBKC also provided calculations of the buy out formulas, as illustrated by Schedule 3 to the License Agreement.  The intent and

25

meaning of the Notice of Buy Out is clear, and plaintiff's argument that it did not satisfy the notice requirements of the License Agreement on this basis is without merit.

Plaintiffs also argue that the Notice of Buy Out did not reflect SOFCO's stake in the value of the Division equal to the Royalty Rate because NBKC's buy out amount did not equal 50% of the value of the Division.  Specifically, plaintiffs contend that this provision gave SOFCO a 50% interest in the value of the Division as a going concern as part of the parties' joint venture, which plaintiffs value as approximately $6.25 million.  Plaintiffs argue that under Section 5(c) of the License Agreement, a sale of the Licensed Assets *and* SOFCO's stake in the value of the Division are required in order to terminate the License Agreement, and thus the two values are separate and distinct.  In other words, plaintiffs contend that by paying SOFCO $50,000 under the first option of the section 6(c) Notice of Buy Out, NBKC would only be entitled to receive the Licensed Assets; SOFCO would retain its interest in the Division and its right to receive 50% of the income from the Division from the existing fractional interest mortgage loan portfolio.[61]

While plaintiffs focus on these limited provisions of the License Agreement, the "cardinal rule" of contract construction requires the court to consider all provisions together and in harmony, rather than in isolation.[62]  The License Agreement provides for different sale or buy out calculations depending on the circumstances.  Section 6(b) states that if there is a sale of the Company to a third party, the Company shall pay to SOFCO for the Licensed Assets a sum equal to the Royalty Rate multiplied by the Net Sales Proceeds upon sale of the Company.  That

---

[61](Doc. 46-4, Ex. C.)

[62]*Decatur County Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (citation omitted).

section goes on to provide that if there is a sale of the Division to a third party, and SOFCO has not exercised its option to purchase the Division, the Company shall pay to SOFCO for the Licensed Assets a sum equal to the Royalty Rate multiplied by Net Sales Proceeds upon sale of the Division.

Section 6(d), the counterpart to the section at issue in this case, provides that SOFCO may give the Company a notice of buy out specifying an amount that SOFCO is willing either to receive for the Licensed Assets or to pay for the sale of Company's interest in the Division.  The amount specified shall also "reflect the Company's and Licensor's understanding that by virtue of its ownership of the Licensed Assets, Licensor shall have a stake in the value of the Division equal to the Royalty Rate."  Like section 6(c), this provision provides that the cash amount to be paid to Licensor if the first option is selected shall be calculated using the Company Purchase Calculation; if the second option is selected, the cash amount shall be calculated using the Licensor Purchase Calculation.

Section 6(e) provides for amendment of the Royalty Rate and partial buy out if Christian or Jones is no longer employed by the Company.  Section 6(e)(ii) provides that if either Executive is terminated as a result of a "Company Breach" as defined in their Employment Agreements, the Company shall pay to SOFCO a partial buy out amount in an amount equal to the sum of the Division Value, minus Net Assets, minus Negative Carry, plus the unused loan loss reserve attributable to the Division, multiplied by either 17.5% for Jones, or 32.5% for Christian.  If both Executives are terminated the Royalty Rate shall be reduced to 0% and SOFCO shall immediately assign the Licensed Assets to the Company and the License Agreement shall be terminated.  "Division Value" is defined in Section 17(f) as "the value of the

Division as a going concern as determined by an independent valuation company jointly chosen by Company and Licensor."  Plaintiffs offer a valuation prepared by Stern Brothers Valuation Advisors, opining that "the investment value on a controlling interest basis, of 100% ownership of F3 as of March 12, 2008, is $12.5 million."[63]

Plaintiffs argue that when NBKC shut down the Division and refused to fund any further fractional interest mortgage loans, it caused a "material alteration of the executive duties" of Christian and Jones, which constitutes a Company Breach, thus triggering the partial buy out provision in Section 6(e)(ii).  As discussed *infra* in Section III.B.2., however, the Court does not find that the termination of Christian and Jones was due to a Company Breach.  Instead, the provision of the License Agreement applicable to this case is section 6(c).  Significantly, plaintiffs' reading of Section 6(c) omits the agreed upon calculation for the cash amount to be paid Licensor, the Company Purchase Calculation.  The Company Purchase Calculation is defined at Section 17(c) of the License Agreement, and means the sum of the amount specified by the Company in a buy out notice, minus Net Assets, minus Negative Carry, plus the unused loan loss reserve attributable to the Division, multiplied by the Royalty Rate.  A plain reading of this section supports that this is one value, not two—SOFCO's stake in the value of the Division exists by virtue of its ownership in the Licensed Assets and sale of the Licensed Assets under the Section 6(c) buy out provision necessarily includes that stake in the value of the Division as reflected in the Company Purchase Calculation.

Likewise, the fact that SOFCO has a stake in the value of the Division equal to the Royalty Rate does not translate to a 50% interest in the value of the Division as a going concern.

---

[63](Doc. 62-19, Ex. K.)

Under the Company Purchase Calculation, Net Assets are defined in Section 17(m) as "the assets of the Division less liabilities of the Division." Section 6(a) of the License Agreement provides that for purposes of section 6, loans originated through the Division shall not be deemed assets of the Division, and are thus not part of the calculation provided in section 6(c). Therefore, NBKC's notice specifying $319,000 as the amount it was willing to pay SOFCO for its Licensed Assets and resulting stake in the Division, or to receive from SOFCO for the sale of NBKC's interest in the Division, complied with the notice provision of section 6(c).

### *Termination*

Plaintiffs further argue that the License Agreement did not terminate on March 13, 2008 and that NBKC had the duty to preserve the value of the F3 business and to not do anything that would injure or damage the Licensed Assets and goodwill of the business, during the 90-day period SOFCO had to elect whether to be a buyer or a seller. Plaintiffs assert that because NBKC's Notice of Buy Out did not comply with Section 6(c), they were not obligated to perform under that section. NBKC argues that the plain language of the License Agreement provides that either party can terminate the License Agreement upon giving the notice of buy out, and that the Agreement is terminated upon the giving of such notice.

The Court has determined that NBKC's Notice of Buy Out complied with Section 6(c). Thus, under the express terms of the License Agreement, SOFCO had 90 days from the Notice of Buy Out to elect whether to be a seller or buyer. When SOFCO refused to select one of the two options given in the Notice of Buy Out by June 14, 2008, NBKC was authorized to make the selection for SOFCO by written notice within ten days after expiration of the initial 90-day period, and SOFCO was bound by that selection. NBKC provided written notice of its selection

to pay SOFCO for the Licensed Assets on June 23, 2008.  On August 15, 2008, NBKC

forwarded a check in the amount of $50,000, which SOFCO returned.  Section 5(c) of the

License Agreement provides for termination "[u]pon sale of the Licensed Assets and Licensor's

stake in the value of the Division to Company pursuant to Sections 6(c) or 6(d)."  Accordingly,

the License Agreement terminated on August 15, 2008, upon sale of the Licensed Assets and

SOFCO's stake in the value of the Division.[64]

The issue is thus the extent of NBKC's obligations to SOFCO under the License

Agreement in the interim period between the Notice of Buy Out and termination.  Plaintiffs

allege that NBKC had a continuing obligation to preserve the value and goodwill of the Licensed

Assets, and that shutting down the Division, stopping the funding of loans and failing to provide

plaintiffs with loan portfolio information to assist them in locating another funding partner

constitute a breach of the Terms of Use set out in Schedule 4 of the License Agreement.

Paragraph 6 of that schedule states, in relevant part, that the Company will not take any action

during the term of the License Agreement that "would in any way or manner be detrimental to,

injure or impair in any way or to any degree: (i) the Marks; (ii) any applications for registration

and/or registrations therefor; [or] (iii) the respective goodwill related to the Marks. . . ."  The

"Marks" are identified as First Fractional Funding and First Fractional Funding and Design.

Plaintiffs urge that the 90-day election period for SOFCO to decide whether to be a buyer or

seller was "rendered of little or no value" by NBKC's termination of funding for the fractional

interest mortgage loans, including refusal to fund pending loan applications that had been

---

[64]*Cf.* Section 5(d) of the License Agreement, which requires consummation of a buy out by Licensor to terminate the Agreement.

underwritten and approved by plaintiffs, and its subsequent refusal to provide requested loan

portfolio information to plaintiffs that plaintiffs claim was necessary in order to find another

funding source for F3 loan applicants.

   In support of this allegation, plaintiffs offer excerpts from Robert Jones's deposition.  In

response to the questions regarding how the goodwill and marks associated with F3 had been

harmed, Jones stated that he did not know, but that it was reasonable to conclude that they were

somehow damaged.  Plaintiffs also rely on affidavits of Dustin Carfield and Richard Ragatz to

support their allegation that the Licensed Assets were damaged.  Carfield, who is a principal in

NextStar Funding, Inc., a direct competitor of F3, states that he was surprised to learn that

NBKC had made the decision to completely cease the operation of F3 and immediately stop

funding all fractional loans because NBKC had been "courting" NextStar to merge with F3.

Carfield also stated that F3 was noticeably absent from a fractional interest conference in March

2008, and that those in attendance expressed concerns about "the implications of F3 closing on

the fractional real estate industry and our business in particular."  Carfield concluded that "the

abrupt closure behavior damaged F3 as a business enterprise and their business reputation

suffered as well due to the actions of [NBKC]."  Ragatz, who owns Ragatz Associates, which

provides consulting and conferences for the fractional interest real estate industry, states that

Jones informed him prior to the March 2008 national conference that F3 had been shut down and

that its funding partner, NBKC, had suddenly decided to cease funding fractional interest

mortgage loans.  This came as a "complete surprise" to the other sponsors and attendees, and in

Ragatz's opinion, damaged the reputation of F3 and Christian and Jones, and that

   it would have been difficult for F3 to rehabilitate its previous good

> name and goodwill without promptly finding another lender as a
> funding partner and spending a considerable amount of money and
> energy on marketing and advertising, including a reassuring
> explanation of what had happened and how developers and
> mortgage brokers could count on that not happening again.

Defendant counters that the decision to stop funding F3 loans did not breach the License Agreement.  First, NBKC argues, there is no provision in the License Agreement that requires NBKC to continue funding F3 loans at any time.  Moreover, the Employment Agreements state that the operation of the Division is subject to the control of NBKC.  Second, with respect to Schedule 4 of the License Agreement, Jones's conclusory statement in his deposition that it just seems reasonable to assume that the value of F3 was harmed and that there was harm to the marks is insufficient to withstand summary judgment.  NBKC also points out that Jones could not point to any specific loans that had been underwritten and that NBKC refused to fund, and did not know how many loans might have been involved.  Likewise, plaintiffs merely conclude that confidential loan portfolio information was necessary in order to find another funding partner, without any specifics.  NBKC also objects to the affidavits of Carfield and Ragatz as inadmissible hearsay and conclusory allegations without specific supporting facts.

With respect to plaintiffs' first argument, the Court's review of the License Agreement finds no provision obligated NBKC to continue operating F3 and fund F3 loans after the Notice of Buy Out.  Under the plain, unambiguous terms of the License Agreement, SOFCO granted NBKC the exclusive right and license to use of the Licensed Assets in connection with the business of the Division, consistent with the Terms of Use set forth on Schedule 4.  In exchange, NBKC was obligated to pay SOFCO an annual royalty fee equal to the Royalty Rate of 50%, multiplied by the Pre-Tax Net Income of the Division.  There is no provision in the License

Agreement that required NBKC to operate the Division or to fund F3 loans, either before or after a notice of buy out.  Indeed, the Employment Agreements expressly provide that the operation of the Division is subject at all times to the control of NBKC.  "Where, as here, a contract is unambiguous, [the Court] will not, under the guise of contract interpretation, write a new contract for the parties to achieve some perceived equitable result for which the parties themselves did not bargain."[65]  Accordingly, the Court finds that NBKC was not required to continue the business of the Division at any time.

The issue thus becomes whether NBKC's actions, or inactions, breached its obligations to SOFCO under Schedule 4 not to injure or impair the marks or the goodwill related to the marks.  As a threshold matter, the Court notes that the issue appears to be moot in light of the Court's previous ruling that NBKC did not breach the License Agreement with respect to the Notice of Buy Out.  Federal courts may adjudicate only actual controversies.[66]  "A federal court has no power to give opinions upon moot questions or declare principles of law which cannot affect the matter in issue in the case before it."[67]  As previously discussed, NBKC elected to buy the Licensed Assets when SOFCO refused to make an election after ninety days, and this election is binding on SOFCO.  Thus, although SOFCO has refused to consummate the sale, NBKC is the ostensible owner of the Licensed Assets, and any damage to the Marks or the respective goodwill is now borne by NBKC.   Under these circumstances, there is no longer any issue of injury or impairment to the Licensed Assets with respect to plaintiffs.

---

[65]*Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006) (citations omitted).

[66]*Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990).

[67]*S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997).

Assuming the issue remains a live case or controversy, the Court agrees with NBKC that plaintiffs have failed to raise an issue of material fact with respect to whether the Marks were injured or impaired when NBKC shut down the Division.  Jones's conclusory statement in his deposition that it just seems reasonable to assume that the value of F3 was harmed and there was harm to the marks is insufficient to withstand summary judgment.  Nor could Jones point to any specific loans that had been underwritten and that NBKC refused to fund, and did not know how many loans might have been involved.  Likewise, plaintiffs merely conclude that confidential loan portfolio information was necessary in order to find another funding partner, without any specifics in the record.  Plaintiffs do not contend that they sought out, much less lost, any opportunity to secure another funding partner.  Similarly, the affidavits of Carfield and Ragatz, assuming they are admissible, offer limited support.  Those affidavits primarily consist of conclusory statements and opinions, based on the surprised reactions of the conference attendees to the news that F3 had been shut down, and thus lack probative value.[68]  While the Court must resolve doubts in favor of the parties opposing summary judgment, plaintiffs' conclusory allegations are insufficient to defeat NBKC's adequately supported motion.[69]  Summary judgment is granted on this issue.

## 2.    Employment Agreements

Pursuant to the express terms of each Employment Agreement, Christian and Jones were employed "at will" for NBKC.  The Employment Agreements provided that Christian and Jones

---

[68]*See Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (finding conclusory allegations by affiant insufficient to create a genuine issue of material fact as they lacked probative value).

[69]*See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995).

were "subject always to the direction and control of the Board of Directors" and that the

operation of the Division is "subject at all times to the control" of NBKC.  Section 6(a) sets forth

termination options by the Company and provides, in relevant part,

> (iii) . . . in the event that the Company exercises its rights to buy
> out the ownership interests of SOFCO, LLC in the Licensed Assets
> pursuant to the License Agreement between Company and SOFCO
> . . . and in connection with such sale, Executive receives a notice
> of termination, then Executive shall leave the Company as directed
> in the notice of termination, Executive shall continue to be bound
> by the provisions of Sections 8(b) and 8(c), and the Company shall
> be relieved of all obligations hereunder except Company shall pay
> Executive any Salary for periods worked prior to termination but
> for which Salary has not been paid, and any accrued benefits
> during that time.
>
> (iv) if Executive is terminated at the Company's will and is not
> terminated as set forth [above], then the termination shall be
> deemed a material breach by the Company (**"Company Breach"**)
> of this Agreement. . . ."

Section 6(b) of the Employment Agreements provides for termination by the Executives,

and states that if the Executive resigns and terminates his employment by written notice to the

Company by reason of

> (i) the assignment to Executive by the Company of responsibilities
> that are a material alteration of his executive duties as Executive
> Vice-President; . . .
>
> then his resignation shall be deemed to have been a termination
> due to a Company Breach under Section 6(a)(iv). . . .

Plaintiffs argue that NBKC's decision to shut down F3 was a "material alteration" of the

executive duties of Christian and Jones, thus resulting in termination of their employment as a

result of a Company Breach of the Employment Agreements by NBKC, prompting their

resignations and triggering a partial buy out as defined in section 6(e)(ii) of the License

35

Agreement.  The Court disagrees.  Plaintiffs' "resignations" were not prompted by the "assignment of responsibilities that are a material alteration of their executive duties."  Instead, it was prompted by their termination by NBKC in connection with NBKC's Notice of Buy Out on March 13, 2008.  While shutting down F3 caused a "material alteration" of the duties of Christian and Jones in the sense that they were no longer responsible for managing F3, it certainly did not constitute an "assignment" of responsibilities that materially altered such duties. Section 6(b) clearly contemplates that the Executives would be employed by NBKC when they proffered their resignation.  Instead, the Employment Agreements expressly contemplate the termination of their employment in the event NBKC exercises its buy out rights under the License Agreement.  It is uncontroverted that Christian and Jones were informed of their termination in connection with NBKC's Notice of Buy Out on March 13, 2008.  Since the termination of Christian and Jones fell within the terms of their Employment Agreements, there was no breach, and NBKC is entitled to summary judgment on this claim.

### C.    Breach of Duty of Good Faith and Fair Dealing

"[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term of the contract 'which the defendant allegedly violated by failure to abide by the good faith spirit of that term.'"[70]  "The duty of good faith assumes the existence of a contractual right; it does not create one."[71]  "This

---

[70]*Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 340 F. Supp. 2d 1189, 1201 (D. Kan. 2004) (quoting *Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1188 (D. Kan. 2003) (citations omitted)).

[71]*Id.* (quoting *Bank IV Salina, N.A. v. Aetna Cas. & Surety Co.*, 810 F. Supp. 1196, 1204 (D. Kan. 1992) (citation omitted)).

implied duty requires the parties to an agreement to refrain from 'intentionally and purposefully do[ing] anything to prevent the other party from carrying out his part of the agreement, or do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"[72]

Plaintiffs contend that NBKC violated its duty of good faith and fair dealing by its precipitous cessation of funding F3 loans on March 12, 2008 and sending the Notice of Buy Out the next day, without having first given plaintiffs a "heads up" or any opportunity to discuss it with NBKC, and without continuing the business or preserving the value of the Division until a proper buy out under the License Agreement was accomplished.  Plaintiffs also contend that NBKC then refused to allow plaintiffs to have information about the F3 loan portfolio to provide to prospective alternative funding sources, to be able to continue the business of F3, and damaged or destroyed the prospects of plaintiffs having any opportunity to preserve and continue the F3 business enterprise so that SOFCO would have a meaningful election during the ninety day period under section 6(c).

Because the Court has previously held that the License Agreement did not impose an obligation on NBKC to continue operating the Division or funding F3 loans, "such an obligation cannot be created through application of the implied covenant."[73]  Although plaintiffs are unable to identify any action by NBKC constituting a breach of the written agreements, they argue, in effect, that even if NBKC complied with the terms of the agreements, those terms were not fair

---

[72]*Id.* (quoting *Kay-Cee Enters., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 846 (D. Kan. 1999) (citation omitted)).

[73]*Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006).

to plaintiffs.  The flaw in plaintiffs' argument "lies in the rule of law that the implied covenant cannot create a contractual right."[74]  Plaintiffs argue that requiring NBKC to continue the business of F3 uninterrupted was necessary to protect their opportunity to purchase and continue operation of the Division.  But continued operation was not required under the License Agreement.  If plaintiffs desired a "heads up" prior to a notice of buy out or continued operation of the Division afterwards, they should have contracted for it.

## IV.    Motion for Leave to Amend Complaint

Plaintiffs move the Court for leave to amend their Complaint to add alternative counts for fraudulent inducement and negligent misrepresentation.  NBKC objects, arguing that the motion is inexcusably late, will cause it prejudice and is futile.

Federal Rule of Civil Procedure 15(a)(2) allows a plaintiff to amend a complaint as a matter of course within prescribed limits, and allows the court to grant leave to amend "when justice so requires."  It is within the court's discretion to grant leave to amend a complaint when a plaintiff knows or should have known of the information on which the proposed amendment is based.[75]  The court should refuse leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith, or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of the amendment."[76]

### *Undue Delay*

When considering the timeliness of a motion to amend, the court focuses on the reason

---

[74]*Terra Venture*, 340 F. Supp. 2d at 1201.

[75]*Trotter v. Regents of the Univ. of N.M.*, 219 F.3d 1179, 1185 (10th Cir. 2000).

[76]*Ali v. Dinwiddie*, 291 F. App'x 164, 166 (10th Cir. 2008).

for any delay.[77]   An inadequate explanation for the delay warrants denial.[78]   In this case, the

scheduling order deadline for filing motions to amend was November 14, 2008.[79]   This motion

for leave to amend was filed February 2, 2009.   Plaintiffs' explanation for the delay is that they

did not learn of NBKC's position denying that a "joint venture" existed between the parties until

it received information from NBKC through discovery on December 15, 2008 and January 7,

2009.   As NBKC points out, however, in its Answer to plaintiffs' Complaint filed September 3,

2008, NBKC specifically denied the allegation that the Division was a joint venture or that

Christian, Jones and NBKC were "partners."[80]   Because the additional facts alleged in the

amended complaint concern the deceitful intent of NBKC, the Court will not deny the motion for

leave on this ground.

### Undue Prejudice

NBKC protests that allowing plaintiffs leave to amend on the eve of close of discovery is

prejudicial.   This is no longer an issue, however, as the Court granted NBKC's motion to stay

discovery pending a ruling on the instant Motion for Summary Judgment.   NBKC also couches

the request to amend as nothing more than a "last ditch effort to retool their lawsuit because of

the shortcomings identified in NBKC's motion for summary judgment."   In essence, NBKC

argues that it would not be fair for it to have to litigate the fraud claims if it is successful on the

contract claims.   NBKC omits, however, that its motion for summary judgment was filed two

---

[77]*Smith v. Aztec Well Serv. Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006).

[78]*Id.* ("'[U]nexplained delay alone justifies the district court's discretionary decision' to deny leave to amend and 'courts have denied leave to amend where the moving party was aware of the facts on which the amendment was based sometime prior to the filing of the motion to amend'.").

[79](Doc. 12.)

[80](Doc. 2, ¶ 8.)

months prior to the pretrial conference and dispositive motion deadline.  The fact that NBKC might be inconvenienced by defending additional claims that would have been addressed in a later-filed dispositive motion does not constitute the type of prejudice warranting denial of leave to amend.

### Futility

A court may deny a motion to amend as futile if the proposed amendment would not withstand a motion to dismiss or if it fails to state a claim upon which relief may be granted.[81]  In order to determine whether a proposed amendment is futile, the court must analyze the proposed amendment as if it were before the court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[82]  To survive a motion to dismiss, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[83]  Under this standard, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[84]  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just

---

[81]*Collins v. Wal-Mart, Inc.*, 245 F.R.D. 503, 507 (D. Kan. 2007) (citing *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992)).

[82]*Id.* (citing *Sheldon v. Vermonty*, 204 F.R.D. 679, 682 (D. Kan. 2001)).

[83]*Bell Atl. Corp v. Twombly*, 550 U.S 544, 554 (2007).

[84]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

speculatively) has a claim for relief.[85]  As the Supreme Court recently explained, "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[86]  Additionally, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[87]

NBKC argues that plaintiffs' new claims for fraud and negligent misrepresentation are futile because they are nothing more than breach of contract claims "dressed up as torts."  Under Kansas law, the basis for a fraud claim must be different from the conduct upon which a breach of contract claim is based and the damages must be greater than those caused by the breach of contract claim alone.[88]  In addition, "'an action for breach of contract [cannot be turned] into an action for fraud by merely alleging reliance on representations that the contract would be performed and detriment from its breach.'"[89]  As the basis for their fraud claim, plaintiffs allege that NBKC represented that the Division was "a profit-sharing joint venture between NBKC and the plaintiffs," and that "in view of NBKC's position that the First Fractional funding venture was not and is not a 'joint venture,' defendant NBKC's representations in this regard were

---

[85]*Robbins v. Oklahoma,* 519 F.3d 1242, 1247-48 (10th Cir. 2008).  "'Plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Id.* (internal citations omitted).

[86]*Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 2009 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

[87]*Id.*

[88]*Wade v. Emcasco Ins. Co.*, 483 F.3d 657, 675 (10th Cir. 2007) (holding that the allegations of fraud were indistinguishable from the breach of contract claims).

[89]*Id.* (quoting *Brown v. Chaffee*, 612 F.2d 497, 503 (10th Cir. 1979)).

false."  Plaintiffs further allege that NBKC intentionally made the representations for the purpose

of inducing plaintiffs to rely and act upon them, and that plaintiffs sustained damage by relying

on such representations.  Similarly, plaintiffs allege as the basis for their negligent

misrepresentation claim that NBKC made false representations to plaintiffs for the guidance of

plaintiffs in their business transactions with regard to the First Fractional Funding venture and

that NBKC failed to exercise reasonable care or competence in obtaining or communicating such

false representations.

Because plaintiffs' claim alleges fraudulent inducement, Kansas law explains that

"[w]hen alleged fraud relates to promises or statements concerning future events, the gravamen

of such a claim is not the breach of the agreement to perform, but the fraudulent representation

concerning a present, existing intention to perform when such intention is in fact nonexistent."[90]

To succeed on their claim, plaintiffs must prove that NBKC never intended to perform upon its

representations that the First Fraction Funding Division was a profit-sharing joint venture

between the parties; that the representations were made with the intent to deceive and to induce

plaintiffs into entering into the License and Employment Agreements; that plaintiffs reasonably

relied upon the representations; and that plaintiffs suffered damages thereby.[91]  "The elements of

negligent misrepresentation are similar to those of a claim for fraud, except that a negligent

misrepresentation claim does not require proof that the defendant knew the statement was untrue

---

[90]*JDN Dev. Co. v. Terra Venture, Inc.*, 265 F. Supp. 2d 1239 1253 (D. Kan. 2003) (citing *Smith v. MCI Telecoms. Corp.*, 755 F. Supp. 354, 356-57 (D. Kan. 1990) (citation and quotation omitted)).

[91]*Id.*

or was reckless as to whether the statement was true or false."[92]  Instead, a negligent

misrepresentation claim "merely requires proof that the defendant failed to exercise reasonable

care or competence to obtain or communicate true information."[93]  These elements are clearly

distinguishable from the elements required to prove breach of contract in this case, and thus the

alleged fraud and negligent misrepresentation qualifies as an independent tort.  Plaintiffs' motion

for leave to amend is granted.[94]

## V.      Pending Discovery Issues

At the time the court granted NBKC's motion to stay discovery pending disposition of

its summary judgment motion,[95] there were several pending discovery related motions: plaintiffs'

Motion to Compel (Doc. 40); plaintiffs' Motion for Leave to File Supplemental Rule 26(a)(2)

Expert Disclosures for Robert L. Clarke (Doc. 42); defendant's Motion to Strike (Doc. 51),

which was couched as a response to the Motion for Leave, but is actually a *Daubert* motion; and

defendant's Motion for Sanctions (Doc. 66).  Defendant's counterclaims against plaintiffs also

remain pending.[96]  Because the landscape of this lawsuit has changed considerably, the Court

will deny these motions, without prejudice to refile, in light of the findings and rulings in this

---

[92]*Indy Lube Investments, L.L.C. v. Wal-Mart Stores, Inc.,* 199 F. Supp. 2d 1114, 1122 (D. Kan. 2002); *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 876 P.2d 609, 616 (1994).

[93]*Indy Lube Investments,* 199 F. Supp. 2d at 1122.

[94]In so ruling, the Court notes that the rule that where the written contract directly contradicts the oral promises made during contract negotiations, the oral promise cannot be construed as fraudulent.  *See Flight Concepts Ltd. P'ship v. Boeing*, 38 F.3d 1152 (10th Cir. 1994) (citing *Edwards v. Phillips Petroleum Co.*, 360 P.2d 23, 26 (Kan. 1961)).  The Court's ruling regarding the existence of a joint venture may or may not implicate this rule. Defendant did not raise this argument in its objection to leave to amend, however, and the Court leaves this issue for another day.

[95](Doc. 68.)

[96](Doc. 2.)

Order.  The Magistrate Judge previously assured plaintiffs that it would allow for an adequate discovery period to address the remaining discovery disputes as well as to conduct any outstanding discovery, and that it would reset the deadlines after the disposition of NBKC's summary judgment motion.[97]  Accordingly, the Court directs the Magistrate Judge to reset the discovery deadlines as well as other deadlines impacted by this Order, including dispositive motions, the pretrial conference and trial date.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant NBKC's Motion for Summary Judgment (Doc. 45) is GRANTED.

**IT IS FURTHER ORDERED** that plaintiffs' Motion for Leave to File First Amended Complaint (Doc. 48) is GRANTED.

**IT IS FURTHER ORDERED** that the following discovery motions are DENIED without prejudice: Plaintiffs' Motion to Compel (Doc. 40); Plaintiffs' Motion for Leave to File Supplemental Rule 26(a)(2) Expert Disclosures for Robert L. Clarke (Doc. 42); Defendant's Motion to Strike (Doc. 51); and Defendant's Motion for Sanctions (Doc. 66).

IT IS SO ORDERED.

Dated:  September 18, 2009

 S/ Julie A. Robinson

JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[97]*Id.*

44