# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **SOFCO, LLC, et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| **vs.** ) | **Case No. 08-2366-JAR** |
| ) | |
| **NATIONAL BANK OF KANSAS CITY,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiffs SOFCO, LLC ("SOFCO"), R. Scott Christian and Robert Jones' (collectively "plaintiffs") Motion for Enforcement of Settlement Agreement (Doc. 86). A hearing was held November 23, 2009, and after hearing the arguments and statements of counsel, the Court took the matter under advisement. For the reasons explained in detail below, plaintiffs' motion is granted.

### *Background*

On September 18, 2009, this Court granted defendant National Bank of Kansas City's ("NBKC") Motion for Summary Judgment on all of plaintiffs' contract claims.[1] Plaintiffs were permitted to file an amended complaint alleging claims for fraud and misrepresentation.[2] NBKC has counterclaimed against plaintiffs, alleging breach of contract, intentional interference with a

---

[1](Doc. 77.)

[2](Doc. 80.)

business relationship, breach of fiduciary duty and defamation.[3]  These counterclaims remain pending.

Settlement discussions between Fritz Riesmeyer, counsel for plaintiffs, and Steve Mauer, counsel for NBKC, began thereafter, and both counsel had authority to negotiate for their respective clients.  Counsel exchanged emails discussing terms of settlement as follows:

- October 13, 2009, from Riesmeyer to Mauer: "Payment to our clients the sum of $150,000.  A settlement agreement **with complete releases**, dismissal of all claims and confidentiality."[4]

- October 15, 2009, from Riesmeyer to Mauer: "our clients have authorized us to settle this case for $125,000.00, **with complete releases**."  Mauer replies later that date: "cash offer to $30,000 plus waiver of costs."[5]

- October 19, 2009, from Mauer to Riesmeyer: "Of course, the settlement agreement would include **a full release** and agreement to execute a full dismissal of claims, each party to bear its own costs."[6]

- October 20, 2009, from Mauer to Riesmeyer: "The Bank will pay $55,000.  **All other terms are the same as our prior discussions.**" Riesmeyer replies later that date: "if settled this week, our clients will accept $100,000 in full and final settlement, with the **mutual releases**."[7]

---

[3](Doc. 2.)

[4]Ex. C (emphasis added).

[5]*Id.*

[6]Ex. D (emphasis added).

[7]Ex. E (emphasis added).

On or about October 21, 2009, counsel for both parties reached consensus during a telephone conference regarding the terms of a settlement agreement as follows:

- NBKC to pay plaintiffs the total sum of $65,000;

- parties to pay their own costs and attorney fees;

- plaintiffs will transfer to NBKC any interest they may have in the "Licensed Assets" and the Fractional Funding Division, "F3";

- "mutual release" of all claims, dismissal of all claims with prejudice; and

- Riesmeyer to draft the settlement agreement and dismissal of claims.

On October 22, 2009, Riesmeyer forwarded to Mauer a draft of a Settlement Agreement.[8] The draft includes mutual general release language:

> **1.  Release by SOFCO, Christian and Jones.** . . . each hereby release, discharge and acquit all claims, actions, cross-claims, third-party claims, actions and causes of action the SOFCO parties may have against NBKC and each of their respective current and former Affiliates, officers, directors, members, managers, employees, agents, representatives, attorneys, shareholders, and insurers **known and unknown** from any and all manner of claims, demands, actions, costs, expenses, obligations, rights, damages, compensation, attorneys' fees, losses, judgments, and/or liability ("Claims") of any nature whatsoever, whether based on tort, contract or any other theory of recovery, **which are in existence on or before the date of this Agreement**, including but not limited to any and all Claims arising out of the operation of NBKC, including the First Fractional Funding Division, the Claims set out in *SOFCO LLC, et al. v. National Bank of Kansas City*, Case No. 08-2366, filed int he District Court for the District of Kansas even if said Claims are not reasonably discoverable at the time of this Agreement. . . .
>
> **2.  Release by NBKC.** . . . does hereby release, discharge and acquit all claims, actions, cross-claims, third-party claims, actions

---

[8]Ex. A.

and causes of action NBKC may have against the SOFCO Parties and each of their respective current and former Affiliates, officers, directors, members, managers, employees, agents, representatives, attorneys, shareholders, and insurers **known or unknown** from any and all manner of claims, demands, actions, costs, expenses, obligations, rights, damages, compensation, attorneys' fees, losses, judgments and/or liability ("Claims") of any nature whatsoever, whether based on tort, contract, or any other theory of recovery, **which are in existence on or before the date of this Agreement**, including but not limited to any and all Claims arising out of the operation of NBKC, including but not limited to any and all Claims arising out of the operation of NBKC, including the First Fractional Funding Division, the Claims set out in *SOFCO LLC, et al. v. National Bank of Kansas City*, Case No. 08-2366, filed int he District Court for the District of Kansas even if said Claims are not reasonably discoverable at the time of this Agreement. . . . [9]

On or about November 2, Mauer advised Riesmeyer that the agreement looked fine from his perspective, and he was waiting to hear from his clients with any comments.  On November 5, 2009, Mauer sent Riesmeyer a letter with revised terms, which proposed changes as follows:

- rather than a complete mutual release, NBKC limited the scope of the release so that there is no release for actual fraud, misconduct or malfeasance by plaintiffs; and

- additional wording describing potential consequences of the monetary payment to plaintiffs, to the effect that if the OCC determined the payments were a "golden parachute," plaintiffs would have to repay the settlement amount.[10]

After informing the Court that they had reached a settlement in this matter, the

---

[9] *Id.* (emphasis added).

[10] Ex. B.

parties were directed to file a joint stipulation of dismissal.[11]  Instead, plaintiffs filed this motion.

At the hearing, defendant withdrew the "claw back" provision from its proposed terms, as it

merely wanted to put plaintiffs on notice of possible actions by the OCC outside of NBKC's

control.  Instead, counsel agreed, the issue turned on whether there was a meeting of the minds

on the scope of the term "mutual release."  Plaintiffs argue that the intent was to settle all claims

that had accrued or could have arisen as of the date of the settlement.  NBKC counter that

"mutual release" is not the same as a "general release" of all future claims and that it was never

counsel's intent to release plaintiffs from all future claims stemming from the mortgages they

originated.  Mauer clarified that NBKC agreed to release any known claims against plaintiffs,

including its counterclaims.  Riesmeyer conceded that the parties used the phrase "mutual

release," but did not discuss or agree to release of future claims.  It was Riesmeyer's intent that

"mutual release" encompassed all claims that would have accrued as of the date of the settlement

agreement, including those stemming from mortgages that had originated and closed as of the

date of the agreement, including unknown claims.

### *Discussion*

"A trial court has the power to summarily enforce a settlement agreement entered into by

the litigants while the litigation is pending before it."[12]  Because a settlement agreement is a

contract, "[i]ssues involving the formation, construction and enforceability of a settlement

agreement are resolved by applying state contract law."[13]  The Kansas Supreme Court

---

[11](Doc. 85.)

[12]*United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993).

[13]*United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000).

recognizes:

> It is an elemental rule that the law favors compromise and settlement of disputes, and generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it. However, as an exception to the rule, it is well settled that a compromise settlement may be set aside on the ground of mutual mistake of the parties.[14]

Nor will a court inquire into the merits of the underlying suit after a valid settlement agreement absent fraud or bad faith.[15] That some party changes his or her mind about the settlement terms does not amount to allegations of fraud or bad faith.[16]

To be an enforceable oral settlement agreement, there must be a meeting of the minds on all essential terms and the parties must intend to be bound.[17] For there to be a meeting of the minds, the parties must have sufficiently defined the essential terms of the contract.[18] In other words, "[t]o constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract."[19] "Where the intent of the parties is clear that they are negotiating with a definite understanding the terms of any contract are not fully agreed upon and a written formal agreement is contemplated, and no valid, enforceable contract is to exist until the

---

[14]*Krantz v. Univ. of Kan.*, 21 P.3d 561, 567 (Kan. 2001).

[15]*Lewis v. Gilbert*, 785 P.2d 1367 (Kan. Ct. App. 1990).

[16]*Id*. at 1368.

[17]*Dougan v. Rossville Drainage Dist.*, 15 P.3d 338, 352 (Kan. 2000).

[18]*Id*.

[19]*Steele v. Harrison*, 552 P.2d 957, 962 (Kan. 1976) (citations omitted).

execution of such an agreement, a binding contract does not come into existence in the absence of such an execution."[20]

In this case, neither party alleges fraud or bad faith with respect to the oral settlement agreement, and the Court finds nothing in the record to suggest fraud or bad faith in the representations made to the Court concerning the terms of the agreement or the parties' intentions to be bound by their settlement agreement. Neither party expressed any intention to have the settlement conditioned upon further negotiations, the resolution of additional terms, or the reductions of those terms to writing. The Court understands the parties intended to reduce their agreement to writing and reflect the same in an executed document at a later date. The Court finds that the parties agreed to the essential terms of the settlement—plaintiffs agreed to sign over its interest in the Licensed Assets in exchange for payment, all claims would be dismissed with prejudice, and the parties would execute "mutual releases" prepared by plaintiffs' counsel.

Generally, "a 'release' is a discharge of all wrongdoers."[21] "Mutual" means reciprocal.[22] The parties agreed that plaintiffs' counsel would prepare a mutual release, not that the parties would continue negotiating additional terms. Thus, plaintiffs were to prepare a settlement agreement that discharged both parties from wrongdoing. But NBKC contends that there was never a meeting of the minds with respect to the scope of that release. According to NBKC, it agreed to a "full release" of all claims, not a "general release" of all future claims, as included in

---

[20]*Weil & Assoc. v. Urban Renewal Agency*, 479 P.2d 875, Syl. ¶ 6 (Kan. 1971).

[21]*Stueve v. Am. Honda Motors Co.*, 457 F. Supp 740, 746 (D. Kan. 1978).

[22]BLACK'S LAW DICTIONARY 1039 (7th ed. 1999).

the draft settlement agreement.  NBKC characterizes this language as overreaching by plaintiffs.
The Court disagrees.

Review of what is generally understood to be a "general release" is instructive.  A
general or unconditional release is the broadest form of a release.[23]  By its terms, it releases all
claims, actions, and damages arising from or relating to a particular incident or event or
relationship between the parties.[24]  The effect of a general release is to release any and all
claims.[25]  A general release covers only those matters about which there was some dispute, and
not a future claim.[26]  In other words, a general release will not be construed to bar the
enforcement of a claim that had not accrued as of the date of the release.[27]

During settlement discussions, the parties used the terms "complete" and "full" when
discussing the mutual releases.  At no time prior to the October 21, 2009 agreement was there
any discussion of NBKC excluding certain claims from the release.  Although Riesmeyer
conceded at the hearing that counsel never discussed future, unknown claims, the scope of the
release does not contemplate those types of claims.  Instead, the release captures those claims
which could have arisen prior to the date of the settlement agreement—in other words, claims
arising out of the mortgages that had originated and closed as of the date of the settlement
agreement.  Any claims that arise after that date would be future claims and not included in the
release.

---

[23]29 WILLISTON ON CONTRACTS § 73.4 (4th ed.).

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Id.* § 73.10.

Moreover, Mauer indicated to Riesmeyer that the draft settlement agreement with the mutual general release provisions was acceptable; if NBKC had always intended the release to be limited, Mauer's response to the draft should have so indicated. Instead, after consulting with his client, Mauer prepared a revised settlement agreement that incorporated additional release terms with limitations on the scope of the release that, in effect, did away with the mutual nature of the agreement. As Mauer explained at the hearing, NBKC was concerned that a borrower might file suit in the future alleging it was defrauded by plaintiffs in one of the mortgages they originated. Yet, defendant's exception of these so-called future claims relating to fraud stemming from the mortgages would except the same types of claims that are asserted in defendant's counterclaim against plaintiffs. Plaintiffs were not obligated to agree to these additional terms. The parties agreed that Riesmeyer would prepare the "full" and "complete" mutual release, not that the parties would continue negotiating additional terms. Defendant did not offer a definition or explanation of what is understood to be a "full" release or why it differs from a general release, and the Court's research did not find any such discussion or distinction.

Accordingly, the Court finds that the parties entered into a valid, enforceable settlement agreement in which defendant agreed to pay plaintiffs $65,000, in exchange for assignment of the License Agreement and a stipulation of dismissal and mutual release of claims. The additional terms added to defendant's proposed settlement agreement excepting certain claims against plaintiffs were not a part of that agreement.

**IT IS THEREFORE ORDERED** that plaintiffs' Motion to Enforce Settlement Agreement (Doc. 86) is GRANTED. The parties shall execute a settlement agreement incorporating a mutual release consistent with this Order, as well as a joint stipulation of

dismissal of all claims pending before the Court.

IT IS SO ORDERED.

Dated: <u>August 3, 2010</u>

<u> S/ Julie A. Robinson </u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE